******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

WALTER HINDS *v.* COMMISSIONER
OF CORRECTION
(AC 35043)
(AC 35081)

Lavine, Alvord and Bishop, Js.

*Argued March 11—officially released August 5, 2014*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Erika L. Brookman*, assistant state's attorney, with
whom, on the brief, were *Kevin D. Lawlor*, state's attor-
ney, *Mary M. Galvin*, former state's attorney, and
*Michael E. O'Hare*, former senior assistant state's attor-
ney, for the appellant-appellee (respondent).

*Adele V. Patterson*, senior assistant public defender,
for the appellee-appellant (petitioner).

*Opinion*

BISHOP, J. In this habeas corpus action, the petitioner, Walter Hinds, appeals from the judgment dismissing the second count of his petition. In support, the petitioner claims that the habeas court incorrectly determined that the cumulative effect of the trial court's alleged errors in his underlying criminal trial did not deprive him of a fair trial. The respondent, the Commissioner of Correction (commissioner), in turn, appeals from the judgment granting the petitioner a new trial on the first count of the petition. The commissioner claims that the habeas court incorrectly concluded that the petitioner was not procedurally defaulted from asserting his habeas claims and that the court, on the merits, incorrectly determined that the petitioner was denied a fair trial on the count in question. We affirm the judgment of the habeas court.[1]

The following undisputed facts and procedural history are relevant to our consideration of the issues on appeal. Following a trial to the jury, the petitioner was found guilty of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). The petitioner was thereafter given consecutive sentences of twenty years and twenty-five years imprisonment for a total effective sentence of forty-five years incarceration. The petitioner remains in the custody of the commissioner.

Following the judgment of conviction and sentencing, the petitioner appealed to this court, which, in turn, affirmed the judgment. *State* v. *Hinds*, 86 Conn. App. 557, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005).[2] In its opinion, this court recited the following legally relevant factual history: "On August 28, 2000, sixteen year old high school student K was working as a cashier at the Super Stop & Shop supermarket in Milford. After finishing work at approximately 9 p.m., K left the store and started on foot to a friend's apartment that was approximately five minutes away. The route K followed required her to walk past buildings adjacent to Super Stop & Shop, to cross Seeman's Lane and to cut through the property of In-Line Plastics Tool Company (In-Line Plastics). As she crossed Seeman's Lane, K noticed a pickup truck exit the driveway of In-Line Plastics, reenter the parking area and come to a stop. As she walked past the truck, she turned around and observed that the driver had exited the vehicle and was walking behind her. She continued walking and, upon turning around again, she saw that the driver was right behind her and wearing only underwear and a sleeveless shirt. Although it was nighttime, the area was lit by lights on the surrounding buildings, enabling her to see the driver's face.

"At that point, K started to run. The [petitioner] ran

after K, grabbed her and put one of his hands around her waist and his other hand over her mouth. He instructed her not to scream or he would kill her. The [petitioner] then threw K to the pavement and dragged her by the legs into the bushes behind the In-Line Plastics building. The [petitioner] sat on her chest with his feet on the outside of her arms and instructed K to open her mouth. He inserted his penis into her mouth and forced her to perform fellatio on him, ejaculating into her mouth. The [petitioner] then patted her on the cheek and told her she could leave. Too afraid to move, K remained where she was and, as the [petitioner] walked back toward his truck, pleaded with him not to kill her, telling him that she would not tell anybody what had happened. The [petitioner] turned around and looked at K, enabling her to see his face again. He then entered his truck and drove away." (Footnote omitted.) Id., 559–60.

In 2008, following his conviction and unsuccessful direct appeal, the petitioner brought a habeas corpus petition in four counts. *Hinds* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-03-0823519-S (July 22, 2009). In the first count, the petitioner set forth various allegations of trial counsel's purported ineffectiveness. Id. In count two, the petitioner alleged that the trial judge made prejudicial comments and erred in ordering that the petitioner remain shackled during trial. Id. In count three, he alleged that the cumulative errors of the trial court and his trial counsel deprived him of a fair trial. Id. And, in count four, he alleged that he was actually innocent of the crimes for which he was convicted. Id. Following a habeas trial, the court denied the petition. Id. On review, this court dismissed the appeal. *Hinds* v. *Commissioner of Correction*, 126 Conn. App. 905, 12 A.3d 1099, cert. denied, 301 Conn. 901, 17 A.3d 1043 (2011).

On October 20, 2009, the petitioner brought this petition. In a two count amended petition, filed April 5, 2012, the petitioner alleged that (1) his conviction of kidnapping in the first degree should be reversed due to constitutional errors in the jury charge; and (2) multiple errors by the trial court, deemed harmless on direct review, had the cumulative effect of violating his rights to due process of law and a fair trial. In response to the amended petition, the commissioner filed a return alleging, inter alia, that the petitioner's claim regarding the trial court's jury instruction was procedurally defaulted on the basis of the petitioner's failure to raise the jury instruction issue at trial and on direct appeal. The commissioner asserted, as well, that the claim regarding the purported cumulative effect of multiple errors by the trial court was procedurally defaulted and that a claim premised on the aggregation of nonconstitutional errors is not cognizable at law.

In his reply to the return, the petitioner claimed, as

to the alleged instructional deficiency, that he should not be procedurally defaulted. He further claimed that, if the doctrine of procedural default applies, he can demonstrate good cause for his failure to raise the instructional claim at trial and that he was prejudiced by the trial court's failure to instruct the jury properly regarding the kidnapping charge. In response to the commissioner's return regarding the second count, the petitioner alleged that the claim regarding multiple errors by the trial court did not arise until this court, on direct review, found that multiple errors had taken place. Additionally, the petitioner claimed that he brought the second count to protect the record for purposes of exhaustion and in the event of a future change in the law regarding whether nonconstitutional missteps by the trial court can be aggregated in assessing whether they had the cumulative effect of denying him a constitutionally fair trial.

Following a trial, the habeas court granted count one of the petition, vacated the petitioner's conviction and sentence on the kidnapping charge and remanded the case to the trial court for further proceedings. The habeas court also denied the petitioner's claim set forth in the second count, which was premised on the cumulative effect of trial court errors. Thereafter, the court granted the commissioner's petition for certification to appeal from the judgment as to the first count and granted the petitioner certification to appeal from the denial of relief on the second count of the petition. This consolidated appeal followed.

## I

### JURY INSTRUCTIONS

We review the court's determination as to each count in turn. As to the first count, regarding the trial court's jury instruction, the petitioner alleges that the court failed to charge the jury in accordance with the jury instruction set forth by our Supreme Court in *State v. Salamon*, 287 Conn. 509, 949 A.2d 1092 (2008). In *Salamon*, the court held that "to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime." Id., 542. The court further stated: "[A] defendant may be convicted of both kidnapping and another substantive crime if, at any time prior to, during or after the commission of that other crime, the victim is moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime. Whether the movement or confinement of the victim is merely incidental to and necessary for another crime will depend on the particular facts and circumstances of each case. Consequently, when the evidence reasonably supports a finding that the

restraint was *not* merely incidental to the commission of some other, separate crime, the ultimate factual determination must be made by the jury. For purposes of making that determination, the jury should be instructed to consider the various relevant factors, including the nature and duration of the victim's movement or confinement by the defendant, whether that movement or confinement occurred during the commission of the separate offense, whether the restraint was inherent in the nature of the separate offense, whether the restraint prevented the victim from summoning assistance, whether the restraint reduced the defendant's risk of detection and whether the restraint created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense." (Emphasis in original; footnote omitted.) Id., 547–48.

The parties are in agreement that the jury in the underlying criminal case was not charged in accordance with the dictates of *Salamon*. This is not, of course, a criticism of the trial court because the decision in *Salamon* was issued several years after the petitioner's criminal trial. Indeed, the trial court charged the jury in accordance with the then existing law regarding the crime of kidnapping in the first degree. Specifically, the court instructed the jury: "Count number one; kidnapping in the first degree. A person is guilty of kidnapping in the first degree when he abducts another person and when he restrains the person abducted with intent to inflict physical injury upon him or her, or violates or abuses her sexually. The information informs, or alleges, that [the petitioner] on or about the 28th day of August, 2000, at approximately 9 p.m. in the area of Bridgeport Avenue and Seeman's Lane, the said [petitioner] did abduct another person, and he restrained the person abducted with intent to abuse that person sexually, in violation of the Connecticut General Statutes. And the person abducted and sexually abused testified to in this courtroom by [K] as that person, based upon the testimony if you so believe it.[3]

"I shall now define for you the various terms used in the statute. The first term is 'abduct.' Abduct means to restrain a person with intent to prevent her liberation either by secreting or hiding that person in a place where she is not likely to be found or by using or threatening to use physical force or intimidation. That's abduction.

"The next term to be defined is 'restrain.' Restrain means to restrict a person's movement intentionally and unlawfully in such a manner as to interfere substantially with her liberty by moving her from one place to another and by confining her in the place where the restrictions first begin or in a place which she has been moved without consent. Without consent includes, but is not limited to, deception. As you can see, the abduction

and restraining must be intentional. There must be an intent to interfere intentionally with the victim's liberty. Here, and I will use the word victim, I mean [K], and with [K's] liberty and an intent to prevent [K's] liberation either by secreting or hiding her in a place where she is not likely to be found or by using or threatening to use physical force or intimidation.

"Intent; intent relates to the condition of mind of the person who commits the act. His purpose in doing it; as defined by our statute, a person acts intentionally with respect to a result or to conduct when his conscious objective is to cause such result or to engage in such conduct. What a person's purpose, intention, or knowledge has been is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain purpose or intention or a certain knowledge to do harm to another. The only way in which a jury can ordinarily determine what a person's purpose, intention, or knowledge was at any given time, aside from that person's own statements or testimony, is by determining what that person's conduct was and what the circumstances were surrounding that conduct and from that infer what his purpose, intention, or knowledge was. To draw such an inference is not only the privilege, but also the proper function of a jury. To provide, of course, that the inference drawn complies with the standards for inferences as explained in connection with my instructions on circumstantial evidence. Thus, either [K] must have been moved from one place to another, or [K] had been confined in the place where the restriction first began, or in the place where she has been moved without her consent. There is no special requirement that the restraint be for any particular length of time, or that [K] be moved over any particular distance. Any time period of restraint and distance of moving of [K] is sufficient to constitute these elements of kidnapping. You may, however, consider the length of time and distance together with all circumstances in determining the question of intention. The law which makes kidnapping criminal punishes interference with personal liberty restricting the victim's freedom of movement. So, you cannot find kidnapping until you first find it established that there was such restriction of movement and that it has been done intentionally. That is, it has been done without right or authority of law. That it has had the effect of interfering substantially with the victim's liberty.

"Abduction may be established by satisfactory proof that [K] had been unlawfully restrained and that with intent to prevent her liberation, the [petitioner] restrained her by using or threatening to use physical force or intimidation. Abduction need not be proved by establishing the use of force or intimidation if the proof establishes that the [petitioner] threatened its use in such a manner that [K] reasonably believed that force

would be applied to her if she sought to escape or to thwart the abductor's intention."

Notably, the trial court's instruction did not advise the jury that in order to find the petitioner guilty of kidnapping, the jury would have to find that "the victim [was] moved or confined in a way that has independent criminal significance, that is, the victim was restrained to an extent exceeding that which was necessary to accomplish or complete the other crime," an instruction made mandatory by *Salamon*'s holding. *State* v. *Salamon*, supra, 287 Conn. 547.

As noted, the trial court's instruction was entirely in accord with the then long-standing judicial gloss on the meaning of the language of our kidnapping statute. Indeed, in *State* v. *Chetcuti*, 173 Conn. 165, 377 A.2d 263 (1977), our Supreme Court affirmed the conviction of kidnapping in the first degree where a defendant claimed, on appeal, that the trial court should have instructed the jury that he should not be found guilty of kidnapping when the abduction and restraint of the victim were incidental to his attempted sexual assault of the victim. Id., 169. In rejecting the defendant's claim, the court observed that the charge requested by the defendant was not an accurate statement of Connecticut law. Id., 171. The court continued: "In any event, the legislature of this state has seen fit not to merge the offense of kidnapping with sexual assault or with any other felony. Nor has the legislature imposed any time requirement for the restraint, nor any distance requirement for the asportation to constitute the crime of kidnapping. In view of the express terms of the statute and the fact that the defendant's requests to charge were not an accurate statement of the law of this state . . . the court was not in error in denying the requests to charge." (Citation omitted; footnote omitted.) Id., 170–71.

*Chetcuti* was not an outlier. To the contrary, its holding was expressly and routinely followed in ensuing cases. See, e.g., *State* v. *Lee*, 177 Conn. 335, 343–44, 417 A.2d 354 (1979) ("Kidnapping requires that there be abduction. Abduction means restraint with the intent to prevent liberation. Whether in a given case the restraint is accompanied by the requisite intent, so as to constitute kidnapping, or is merely incidental to another felony, is ordinarily a question for the jury. . . . Where the requisite intent is present, the fact that the perpetrator's underlying motive for the detention is the consummation of another crime, the prevention of his detection, or the facilitation of his flight, does not preclude a conviction for kidnapping." [Citations omitted.]); see also *State* v. *Briggs*, 179 Conn. 328, 338–39, 426 A.2d 298 (1979) ("The defendant urges us to adopt the merger doctrine of *People* v. *Levy*, 15 N.Y.2d 159, 256 N.Y.S.2d 793, cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 [1965], and its progeny which

would preclude the prosecution for a kidnapping which is merely incidental to the sexual assault. . . . This court recently considered the defendant's argument in *State* v. *Lee*, [supra, 335], and *State* v. *DeWitt*, 177 Conn. 637, 419 A.2d 861 [1979] where we held that the defendant may be convicted of kidnapping in the second degree in addition to a conviction for robbery even though the convictions grew out of the same conduct as long as the state was able to prove, beyond a reasonable doubt, all of the essential elements of each crime. . . . Where the intent required to constitute a kidnapping in the second degree is present, the fact that the perpetrator's underlying motive for the detention is the consummation of another crime . . . does not preclude a conviction for kidnapping." [Citations omitted; footnote omitted; internal quotation marks omitted.]), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *Vass*, 191 Conn. 604, 614–15, 469 A.2d 767 (1983) (trial court did not err in refusing to instruct jury that defendant could not be convicted on kidnapping charge if it found kidnapping was " 'integral or incidental' " to sexual assault; where, as here, state proves all elements of kidnapping, defendant may be convicted of that crime in addition to another felony even though two offenses arose out of same course of conduct); *State* v. *Burak*, 12 Conn. App. 613, 615, 533 A.2d 237 (1987) ("[o]ur Supreme Court has rejected the doctrine which would merge the act of kidnapping into the other crime charged where the kidnapping was merely incidental to such crime").

Finally, and pointedly, in *State* v. *Luurtsema*, 262 Conn. 179, 200, 811 A.2d 223 (2002), released on December 24, 2002, our Supreme Court rejected the defendant's claim that the movement of the victim from a couch to the floor, the removal of her clothes, the forcing of her legs apart and the manual choking of the victim did not constitute an abduction and were acts merely incidental to the sexual assault. In its response to the defendant's arguments, the court opined: "In light of our conclusion that the kidnapping statute does not require movement of the victim, the defendant's arguments are without merit. In rejecting the defendant's arguments, we emphasize that our legislature has not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping." (Internal quotation marks omitted.) Id., 202. The court continued: "Thus, any argument imputing a temporal requirement to the restraint element or a distance requirement for abduction under the kidnapping statute must fail. Furthermore, any argument that attempts to reject the propriety of a kidnapping charge on the basis of the fact that the underlying conduct was integral or incidental to the crime of sexual assault also must fail. . . . The defendant's interpretation of the kidnapping statute is simply not the law of

this state. . . . Accordingly, [t]he proper inquiry is not whether the kidnapping was incidental to [other offenses], but whether the restraint was accomplished with the requisite intent to constitute kidnapping, as well as the state of mind required for [the other offenses]." (Citations omitted; internal quotation marks omitted.) Id., 202–203.

From this brief survey of decisional law from 1979 through 2002, the year of the petitioner's conviction, it is manifest that the Supreme Court's new interpretation of the kidnapping statute, later set forth in 2008 in *Salamon*, was not only not the law of this state at the time of the petitioner's criminal trial, but, the holding embraced by *Salamon* was expressly and uniformly rejected in a succession of cases originating with *Chetcuti* in 1977, and still in effect when the petitioner's criminal trial took place.

In sum, *Salamon* represented a substantive change in the court's interpretation of the language of the kidnapping statute. As the court in *Salamon* stated: "Upon examination of the common law of kidnapping, the history and circumstances surrounding the promulgation of our current kidnapping statutes and the policy objectives animating those statutes, we now conclude the following: Our legislature, in replacing a single, broadly worked kidnapping provision with a gradated scheme that distinguishes kidnappings from unlawful restraints by the presence of an intent to prevent a victim's liberation, intended to exclude from the scope of the more serious crime of kidnapping and its accompanying severe penalties those confinements or movements of a victim that are merely incidental to and necessary for the commission of another crime against that victim. Stated otherwise, to commit a kidnapping in conjunction with another crime, a defendant must intend to prevent the victim's liberation for a longer period of time or to a greater degree than that which is necessary to commit the other crime.

"Our failure previously to recognize such an exclusion largely has eliminated the distinction between restraints and abductions and effectively has merged the statutory scheme such that it now closely resembles the provision that the scheme was intended to replace. Unfortunately, that interpretation has afforded prosecutors virtually unbridled discretion to charge the same conduct either as kidnapping or as an unlawful restraint despite the significant differences in the penalties that attach to those offenses. Similarly, our prior construction of the kidnapping statutes has permitted prosecutors—indeed, it has encouraged them—to include a kidnapping charge in any case involving a sexual assault or robbery. In view of the trend favoring reform of the law of kidnapping that existed at the time that our statutes were enacted, and in light of the [Commission to Revise the Criminal Statutes'] stated goal of creating

a modern, informed and enlightened penal code, it is highly likely that our legislature intended to embrace that reform, thereby reducing the potential for unfairness that had been created under this state's prior kidnapping statutes." (Footnote omitted.) *State* v. *Salamon*, supra, 287 Conn. 542–44.

And, as to the court's more limited interpretation of the kidnapping statute enunciated in *Salamon*, the court, subsequently, adopted a guidepost for the retroactive application of its holding. In *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 764, 12 A.3d 817 (2011), the court stated: "Accordingly, we adopt a general presumption in favor of full retroactivity for judicial decisions that narrow the scope of liability of a criminal statute." The court continued: "We emphasize that in the *Salamon* context in particular, any exceptions to the general presumption in favor of full retroactivity are likely to be few and far between." Id. Consistent with that reasoning, the court, in *State* v. *Fields*, 302 Conn. 236, 239, 24 A.3d 1243 (2011), which arose after *Salamon*, determined that the defendant was entitled to a new trial on a kidnapping charge because the trial court had failed to instruct the jury, in accordance with *Salamon*, that if it found that the restraint of the victim was merely incidental to the defendant's commission of the assault, it could not find him guilty of kidnapping.

On the basis of our review of the record, we believe the petitioner would be entitled to a new trial on the kidnapping charge because of the court's failure to instruct the jury in accordance with the instructional dictates of *Salamon* so long as he is not procedurally defaulted from now making that claim in the habeas context.

## II

## PROCEDURAL DEFAULT

We turn now to a consideration of the procedural default doctrine. In essence, the procedural default doctrine holds that a claimant may not raise, in a collateral proceeding, claims that he could have made at trial or on direct appeal in the original proceeding and that if the state, in response, alleges that a claimant should be procedurally defaulted from now making the claim, the claimant bears the burden of demonstrating good cause for having failed to raise the claim directly, and he must show that he suffered actual prejudice as a result of this excusable failure. Our summary is elucidated by the following history.

In the 1977 case of *Wainwright* v. *Sykes*, 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), the United States Supreme Court held that a petitioner's failure to timely object to certain statements at his criminal trial in accordance with the applicable state court evidentiary rule, absent a showing of cause for the failure to comply

with the evidentiary rule and some showing of actual prejudice, would bar federal habeas corpus review of his conviction. Id., 87. In Connecticut, the procedural default rule set forth in *Wainwright* was adopted and applied to state habeas corpus petitions in *Johnson* v. *Commissioner of Correction*, 218 Conn. 403, 409, 589 A.2d 1214 (1991). Since *Johnson*, a habeas petitioner is barred from asserting a claim in a habeas petition that could have been raised in the underlying criminal proceeding unless he is able to demonstrate good cause for having failed to raise such a claim and actual prejudice resulting from the failure to raise the claim in the criminal proceedings. Id., 419.

Cases decided since *Wainwright* and *Johnson* have further elucidated the parameters of "cause" and "prejudice." We turn first to a consideration of cause. In the United States Supreme Court case of *Reed* v. *Ross*, 468 U.S. 1, 104 S. Ct. 2901, 82 L. Ed. 2d 1 (1984), the court opined: "Because of the broad range of potential reasons for an attorney's failure to comply with a procedural rule, and the virtually limitless array of contexts in which a procedural default can occur, this court has not given the term cause precise content. . . . Nor do we attempt to do so here. Underlying the concept of cause, however, is at least the dual notion that, absent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel . . . and that defense counsel may not flout state procedures and then turn around and seek refuge in federal court from the consequences of such conduct . . . . A defense attorney, therefore, may not ignore a State's procedural rules in the expectation that his client's constitutional claims can be raised at a later date in federal court. . . . Similarly, he may not use the prospect of federal habeas corpus relief as a hedge against the strategic risks he takes in his client's defense in state court. . . . In general, therefore, defense counsel may not make a tactical decision to forgo a procedural opportunity— for instance, an opportunity to object at trial or to raise an issue on appeal—and then, when he discovers that the tactic has been unsuccessful, pursue an alternative strategy in federal court. . . . On the other hand, the cause requirement may be satisfied under certain circumstances when a procedural failure is not attributable to an intentional decision by counsel made in pursuit of his client's interests. And the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the requirement is met. If counsel has no reasonable basis upon which to formulate a constitutional question, setting aside for the moment exactly what is meant by reasonable basis . . . it is safe to assume that he is sufficiently unaware of the question's latent existence that we cannot attribute to him strategic motives of any sort." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 13–15. The court in *Reed* concluded:

"Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar." Id., 15.

From this language, we believe that counsel's failure to raise an issue for which there was no reasonable basis may, indeed, satisfy the cause requirement. Our Supreme Court, in *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 403, appears to have adopted a similar approach. There, in rejecting the petitioner's appeal, the court commented: "From the viewpoint of federal constitutional law at the time of the petitioners' trials, it can hardly be contended that there was no reasonable basis for challenging a jury array upon the ground that a statute, such as [General Statutes] § 51-220, might have a disproportionate impact on the availability of minority jurors. Such a claim had been made prior to 1975 in *State* v. *Townsend*, [167 Conn. 539, 548–50, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975)], before any of these petitioners had been tried and was not categorically rejected." *Johnson* v. *Commissioner of Correction*, supra, 422.

In the case at hand, in light of our Supreme Court's affirmation and reaffirmation of its holding in *Chetcuti*, there was no reasonable basis for counsel to have asked the court in the petitioner's criminal trial for an instruction not then permitted and, indeed, expressly rejected by then controlling decisional law. Moreover, given the pre-*Salamon* status of the judicial gloss on the kidnapping statute, there was good reason, based on professionalism, for counsel not to have sought a *Salamon* instruction at trial and to have challenged on appeal the absence of such a charge. This court has stated, in regard to the practice of raising multiple claims on appeal: "A shotgun approach does a disservice both to this court and to the party on whose behalf it is presented. . . . Naturally, an appellate court is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one [issue] . . . ." (Internal quotation marks omitted.) *Boccanfuso* v. *Conner*, 89 Conn. App. 260, 263 n.2, 873 A.2d 208, cert. denied, 275 Conn. 905, 882 A.2d 668 (2005). See also, to the same effect, *Kilduff* v. *Adams*, *Inc.*, 219 Conn. 314, 320 n.5, 593 A.2d 478 (1991), and *Latham & Associates*, *Inc.* v. *William Raveis Real Estate*, *Inc.*, 218 Conn. 297, 300, 589 A.2d 337 (1991). Because there was no reasonable basis for trial counsel to have asked for a *Salamon* type charge and, indeed, strong reason for counsel not to seek such a charge in light of the then prevailing judicial gloss on the kidnapping statute, we agree with the habeas court's conclusion that the petitioner satisfied the cause prong of the cause and prejudice standard.

At the outset, we note that, on the issue of prejudice, the habeas court stated that it was not clear beyond a reasonable doubt that the verdict on the kidnapping charge would have been the same even if the jury had been properly instructed. To the extent that the habeas court found that the commissioner has the burden of proving the absence of prejudice, we disagree. The petitioner has the burden of proving both cause and prejudice. Because the issue of whether the petitioner met his burden of proving prejudice in order to avoid the bar of procedural default involves a question of law, however, we conduct our own analysis, on review, of whether this legal standard has been met without the necessity of remanding the case for the habeas court's determination. See *Mish* v. *Commissioner of Correction*, 133 Conn. App. 845, 849–51, 37 A.3d 179, cert. denied, 305 Conn. 918, 47 A.3d 390 (2012). In making his argument that the commissioner should bear the responsibility to prove prejudice, the petitioner incorrectly attempts to draw an analogy between the scope of appellate review accorded a defendant on direct appeal and during the habeas process. On direct appeal, a defendant may obtain review of an unpreserved claim if the record is adequate for review of the claim and if the claim is of constitutional magnitude. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). And, a defendant asserting a constitutional claim pursuant to *Golding* may succeed if a constitutional violation clearly took place and clearly deprived him of a fair trial, unless the state, in response, is able to demonstrate that the constitutional error was harmless beyond a reasonable doubt. Id. The analogy, however, is not apt, as there are sufficient reasons founded on public policy regarding the due administration of justice as well as fairness that justify the requirement that a petitioner, in a habeas case, who failed to raise an issue in his underlying criminal prosecution, should be required to bear the burden of demonstrating his entitlement to subsequent collateral review.

The differences in the lens of review between a direct appeal and a collateral attack on a conviction were recognized by our Supreme Court in *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 403. There, our Supreme Court opined: "We have concluded, however, that our dictum in [*Payne* v. *Robinson*, 207 Conn. 565, 568–69, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988)] concerning the applicability of the [*State* v. *Evans*, 165 Conn. 61, 327 A.2d 576 (1973)][4] standard of appellate review to constitutional claims first raised in postconviction habeas corpus proceedings was inappropriate. We failed to give sufficient consideration to the special problems that are likely to arise relating to the feasibility of a second trial when a conviction is set aside by a habeas court rather than by an appellate court. These problems are related mainly to the more extended delay of the second

trial that frequently results from a reversal of a conviction by a habeas court. There is no statute of limitation or other time limit that would bar a habeas petition. . . . Ordinarily the petition may not be filed until appellate remedies have been exhausted, lest the petitioner be charged with a deliberate bypass of an appeal. An additional record must be created in the habeas court, which may require extensive testimony. If the petitioner is successful in overturning his conviction, another appeal is almost inevitable.

"A direct appeal following a conviction, on the other hand, is subject to strict time limits at each stage of the proceeding. Except for extraordinary cases, an appeal in this state is ordinarily determined within approximately one year from the date it was filed. The greater time lapse that results when a second trial is ordered by a habeas court has a serious impact on the availability of witnesses and other evidence for the second trial. Memories fade with the passage of time, exhibits are lost, and other evidence is less likely to be available. Appellate counsel would have less incentive to raise on appeal all arguable constitutional claims of the defendant if another opportunity to raise such claims were available in the habeas court. We are convinced that these consequences would be sufficiently harmful to the administration of justice in this state as to require that we withdraw our dictum in *Payne* concerning the applicability of the *Evans* standard for appellate review to habeas corpus proceedings." (Citation omitted; footnote altered.) *Johnson* v. *Commissioner of Correction*, supra, 218 Conn. 415–16.

While the United States Supreme Court in *Wainwright* applied the doctrine of procedural default as a bar to collateral attacks on criminal convictions, the court expressly declined to elucidate the parameters of cause and prejudice. *Wainwright* v. *Sykes*, supra, 433 U.S. 87. The court stated, however, that the prejudice must be actual and not merely speculative. Id. Following *Wainwright*, the Supreme Court, in *United States* v. *Frady*, 456 U.S. 152, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982), opined that, in order to satisfy the prejudice component of the cause and prejudice doctrine, one must "shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." (Emphasis in original.) Id., 170.

In the case at hand, we are satisfied that the petitioner demonstrated actual prejudice and that the trial court's failure to instruct in accordance with the dictates of *Salamon* significantly impacted the trial. From our review of the record, it is clear that evidence of the petitioner's restraint and abduction of the victim indicated that it was closely aligned in time and place to

his sexual assault of the victim. Put another way, the record reveals that the state did not present evidence that the petitioner's restraint and abduction of the victim was sufficiently disconnected from his sexual assault of the victim so as to render the absence of a *Salamon* instruction harmless. To the contrary, given the evidence regarding the proximity in time and location of the restraint and abduction to the sexual assault, there is a reasonable probability that the absence of the *Salamon* instruction prejudiced the petitioner because the presence of such a charge would have required the jury, in order to find him guilty on the kidnapping count, to determine that the restraint and abduction were not merely incidental to the sexual assault, a conclusion it was not asked to make on the basis of the law then applicable.[5] The failure to give a *Salamon* instruction, under the facts presented at trial, substantially deprived the petitioner of his constitutional right to have the jury properly informed of the meaning of the language of the kidnapping charge. For these reasons, the petitioner is entitled to a new trial on the kidnapping count.

### III

### CUMULATIVE EFFECT

The petitioner claimed, as well, at the habeas trial that he is entitled to a new trial on the second count of his petition on the basis of his claim that the cumulative effect of the trial court's errors deprived him of a fair trial. In response to this claim, the habeas court found that the petitioner had not shown his entitlement to a new trial because such a claim is not legally cognizable. We agree.

In response to the petitioner's claim, the commissioner filed a return setting forth two special defenses: (1) that this claim regarding the cumulative effect of the trial court errors is procedurally defaulted; and (2) such a claim is not recognizable at law. The court denied relief on the second basis. Confronted with a similar claim, this court has stated: "Our Supreme Court has rejected a claim that a group of instructional claims of error, none of which was found to constitute reversible error, should be aggregated to form a separate basis for a claim of a constitutional violation of a right to a fair trial . . . and also rejected a claim that the cumulative effect of a variety of alleged improprieties should be the basis of a claim of constitutional violation . . . . We also reject as untenable the creation of a new constitutional claim in which the totality of alleged constitutional error is greater than the sum of its parts." (Citations omitted; internal quotation marks omitted.) *State* v. *Reddick*, 33 Conn. App. 311, 338–39, 635 A.2d 848 (1993), cert. denied, 228 Conn. 924, 638 A.2d 38 (1994). To the same effect, our Supreme Court, in *State* v. *Samuels*, 273 Conn. 541, 871 A.2d 1005 (2005), held that the erroneous admission of the constancy of accusation testimony of four witnesses could not be aggre-

gated to create a legally viable constitutional claim that the cumulative effect of these nonconstitutional missteps deprived the defendant of a fair trial. Id., 562. The petitioner's claim premised on the cumulative effect of the trial court's missteps is therefore without merit.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Both parties individually appealed from the habeas court's judgment. The petitioner challenges the court's dismissal of the second count of his petition; the commissioner appealed from that portion of the judgment granting the petition on the basis of the allegations in the first count. While both appeals were pending, they were consolidated for reasons of judicial economy. We now decide the consolidated appeal.

[2] Because it may have some relevance to the claims made by the petitioner in this habeas appeal, we note that, on direct appeal, this court found that the trial court inappropriately gave a charge on consciousness of guilt, and that the trial court failed to respond adequately to a note from the jury during its deliberations, and abused its discretion in the admission of a certain photograph of the petitioner. *State* v. *Hinds*, supra, 86 Conn. App. 568–69, 574. This court, however, found each of these errors harmless in light of the strength of the state's case. Id., 569, 574.

[3] During its jury charge, the court referred to the victim by name because she had been identified at trial. In this appeal, however, we follow the course this court took on direct appeal in referring to the victim only as "K" for the reasons set forth by this court on direct appeal and in similar circumstances. Accordingly, although the trial court referred to the victim by name, we substitute K as part of our recitation of the court's instructions. *State* v. *Hinds*, supra, 86 Conn. App. 559 n.1.

[4] *State* v. *Evans*, supra, 165 Conn. 61, has since been superseded by *State* v. *Golding*, supra, 213 Conn. 239–40, and stands, generally, for the same proposition regarding the availability of appellate review of unpreserved claims. See also *State* v. *Elson*, 311 Conn. 726,      A.3d      (2014), for the Supreme Court's most recent articulation of the *Golding* requirement.

[5] It is noteworthy that at trial, the only seriously contested issue concerned the adequacy and accuracy of the identification of the petitioner as the perpetrator. There was no serious dispute as to whether both crimes had been committed by a perpetrator as their statutory parameters were then understood.